UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| SOUTHERN REDI-MIX ) | Chapter 11 |
| CORPORATION ) | |
| ) | Case No. 17-13790-FJB |
| Debtor ) | |
| ) | |

**EXPEDITED MOTION BY DEBTOR FOR AUTHORIZATION OF (1) USE OF CASH COLLATERAL, (2) THE GRANTING OF REPLACEMENT LIENS, (3) SCHEDULING A HEARING ON THE FURTHER USE OF CASH COLLATERAL, AND (4) <u>ADDITIONAL RELIEF</u>**

Pursuant to Section 105 and 363 of Title 11 of the United States Code, Federal Rules of Bankruptcy Procedure 2002, 4001 and 9014 and MLBR 4001-2, SOUTHERN REDI-MIX CORPORATION, the above-captioned debtor and debtor-in-possession in this proceeding (the "Debtor"), hereby move this Honorable Court, on an expedited basis, for entry of an order authorizing the use of cash collateral generated by sales and operations (the "Cash Collateral") to maintain the value of the property in order to reorganize. Pursuant to this motion, the Debtor respectfully requests the entry of an order:

(1)    Authorizing use of Cash Collateral in the ordinary course of business;

(2)    Authorizing payments of $1,908.00 as indicated in Exhibit A attached hereto, to first lienholder, Mechanics Cooperative Bank ("Mechanics")[1] to provide adequate protection for the use of Cash Collateral; and

---
[1] The Debtor reserves all rights to object to the amount, extent, priority and validity of the Mechanics' claim.

1

(3)     Granting replacement liens to Mechanics to the extent described in this motion, to provide adequate protection for the use of Cash Collateral.

### I.     Factual Background

**A.     General**

1.     On October 12, 2017 (the "Petition Date") the Debtor filed a voluntary for relief under Chapter 11 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Court").

2.     The Debtor continues to operate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.     Debtor's Business and Background**

3.     The Debtor is a concrete manufacturing and sales corporation located in Marshfield, Massachusetts.  The business operates under the name "Southern Redi-Mix".  The corporation has been in continuous operations since its founding in 1986.

4.     The Debtor leases the premises in Marshfield, which contains approximately three (3) acres of improved land with buildings and a concrete manufacturing plant.  The Debtor has approximately 80 years left on the lease and a level rent payment of $1.00/annually.  In 2012 additional yard space was leased for $5,000 per month with a 60 month term.  This lease expired in July 2017 and the current monthly use and occupancy is approximately $12,000 per month.  This landlord, an unrelated third party, has indicated a willingness to enter into a new comprehensive lease agreement with the Debtor.

5.      In February 2010, Gregory Keelan ("Keelan") and Henry Stout ("Stout") formed an equal partnership, Northern Yankee, LLC ("Northern Yankee").  Northern Yankee acquired 100% of the Debtor.  The purpose was to continue to operate the business and lease the premises.

6.      In February 2012, Gilbert Lopes ("Lopes") of Taunton, Massachusetts, acquired Stout's ownership and in 2013, together with Keelan, formed Bristol Yankee, LLC in order to acquire McCabe Sand and Gravel in Taunton, MA ("McCabe Sand").

7.      The Debtor and McCabe Sand integrated business operations with the sales efforts pushed toward the McCabe Sand facility at the behest of Lopes.  Lopes controlled all financial reporting during the partnership period.

8.      In August 2014, Lopes fired all the Debtor's salesman, without replacement, leaving the Debtor's facility without sales representation in the trade and essentially crippling operations. These actions made the Debtor reliant on McCabe Sand for operational support.

9.      In or around September 2014, Lopes withdrew approximately $130,000 from the Debtor, which funds were obtained from a line of credit established with senior lienholder, Mechanics[2].  These funds are the primary basis of the Mechanics complaint for repayment.  The Debtor did not receive the benefit of these funds.

10.     In approximately November 2014, the Debtor and McCabe refinanced twenty-four pieces of equipment/vehicles (mixers and related equipment) and from this refinance Lopes withdrew $300,000.  This loan was later refinanced in 2015 and the balance owed is approximately $400,000.

---

[2] In July 2012, Mechanics Cooperative Bank established a $170,000 line of credit with the Debtor and included guarantees from Keelan and Lopes.  In March 2016 the line of credit became a demand note.  Lopes is also an incorporator of Mechanics.

3

11.     After Lopes dissipated assets and withdrew cash over $430,000 from the Debtor (much of which remains as obligations today), in approximately January 2015, the Debtor began paying Lopes $75,000 per week for prior purchases of aggregate materials incurred from the previous six-month period. Those payments for sand and gravel lasted twelve weeks through March 2015.

12.     In or around June 2015, Lopes formed a new entity, Redi-Mix Services ("Redi-Mix Svcs"), which holds all the assets of McCabe Sand. Keelan, the Debtor and Northern Yankee have no equity interest in Redi-Mix Svcs and, upon information and belief, the officers and directors of Redi-Mix Svcs are family members of Lopes. Around the same time, Redi-Mix Svcs immediately notified the Debtor's entire customer base that the Debtor (Southern Redi-Mix) was no long their supplier, the "new" supplier was Redi-Mix Svcs and all payments were to be submitted to Redi-Mix, not to the Debtor.

13.     In July 2015, Keelan and Lopes agreed to separate the existing business operations with each owning one business. Keelan became the owner of the Debtor and Lopes became the owner of McCabe Sand (i.e. Redi Mix Svcs).

14.     As part of the partnership termination, the Debtor *inter alia* (1) would pay Lopes approximately $100,000 +/-, from July 2015 through December 2015; (2) would be responsible for the Mechanic's loan; (3) and would pay Lopes approximately $450,000 payable in installments of $3,000/week. This agreement was not beneficial to the Debtor or its creditors and is not fair or equitable. This agreement has resulted in the uses of its cash exceeding available sources and precipitating, along with other events, this chapter 11 filing.

15.     Debtor currently has approximately 13 employees on the Petition Date.

16. As stated above, Debtor currently has a loan with Mechanics. In addition, Debtor has a number of secured asset loans with various auto and equipment financing companies, (Peoples United Equipment, TCF Equipment Finance, Commercial Credit Group, e.g.). These loans are attached to Debtor's Budget. The Debtor also has loans with Libertas, Capital Stack and Forward Financial and other "high interest" lenders that all combined to pressure the Debtor's cash use and require an orderly restructuring. The Debtor plans to propose adequate protection payments on all these *non-Mechanics* loans. The Debtor asserts that there is also sufficient equity in all of the autos & equipment and considered as a group there is an approximate 50% loan to value ratio.

C.     **Mechanics' Loan**

17. In or around, August 12, 2012, Mechanics made a Loan to the Debtor in the original principal amount of $170,000. This loan was evidenced by a commercial demand promissory note and loan and security agreement.

18. As of this date there remains approximately $156,000 due and owing. Debtor reserves the right to object to all claims and amounts due to Mechanics, particularly surcharges, penalties and excess accruals.

19. Mechanics claims a first-priority security interest in all of Debtor's accounts and inventory including Debtor's cash[3], and a blanket junior lien in all of Debtor's vehicles and equipment.

---

[3] Debtor reserves the right to object to the extent, amount, validity and priority of the Mechanics' lien.

20. On September 25, 2017, Mechanics filed a lawsuit against the Debtor and Keelan, as guarantor, but did not include Lopes in the lawsuit as a guarantor. The lawsuit seeks repayment of the entire Note.

21. In addition, on October 4, 2017, Mechanics received an injunction against the Debtor's use of any collateral secured by the Mechanics loan, outside the ordinary course. The injunction order required the funds received collected by the Debtor in the ordinary course of the sale of Mechanics' collateral be held in a "suspense" account. Despite protest by the Debtor that this order would virtually put the Debtor out of business and disrupt the livelihood of 13 employees and payments, neither Mechanics nor the State Court would consider the equities. Further, Mechanics objected to the Debtor's use of any funds to pay its payroll obligations, thus necessitating this chapter 11 filing.

22. As of the date of filing, the accounts receivables and inventory total approximately $300,000, owed at less than 60 days and additional amount in the 60-90 column.

23. Debtor believes the equity in the vehicles and equipment (after the amounts owed to first lienholders) is approximately $800,000.00[4]. The liquidation value of the equipment is approximately $600,000.

24. Debtor proposes a $1,908.00 monthly payment on the Mechanic's Note. This payment represents the contract rate of payment.

**D.     Events Precipitating the Bankruptcy Filings**

---

[4] This amount is based on the Debtor's information and belief.

25. Beginning in the usual slow quarter from January through March 2016, the Debtor expended $629,000 for leasehold improvements. This decision to start improvements was the result of inaccurate financial statements provided by the then controller. This controller has since been terminated. The reliance on this incorrect information caused the Debtor to suffer a severe cash flow crisis, which resulted in the Debtor securing high-interest loans by factoring its accounts receivables. During these improvements, the plant facility was closed and the Debtor obtained product from alternative sources in order to satisfy existing customer demand. This resulted in a one-time expense charge of approximately $216,000.

26. Due to the lack of cash flow, and pressure from various lenders, it became increasingly difficult for Debtor to operate.

27. Despite the fact that the Debtor was current on all payments to Mechanics and that the loan amount of $157,000 was less than 50% of the value of Mechanics' collateral, due to the Mechanics injunction, the refusal to consent to payroll, and the unwillingness of Mechanics to accept the regular payment plus 20% of all collections, the Debtor had no choice but to file this chapter 11.

## II. REQUESTED USE OF CASH COLLATERAL AND OFFER OF ADEQUATE PROTECTION

**A. Use of Cash Collateral**

28. The Debtor requires the use of the Cash Collateral in order to fund the Debtor's ongoing operations pursuant to 11 U.S.C. 363(c)(2)(A). Absent the use of the Cash Collateral Debtor will be unable to pay the usual and ordinary operating expenses of the business. The use of the Cash Collateral is therefore necessary to preserve the value of the Debtor's estate.

29. The Debtor requests authority to utilize, substantially in accordance with the 8-week Budget (attached as Exhibit A), Cash Collateral to fund its operations.

30. The Debtor proposes to adequately protect Mechanic's for the use of any Cash Collateral as follows:

    a. by granting a replacement lien on the personal property to the extent the lien is properly perfected in pre-petition collateral;

    b. by making monthly payments at the contract rate of $1,905.00;

    c. by maintaining insurance on Debtor's personal property and by paying all post-petition vendor and other administrative costs on a timely basis; and

    d. by operating their business and pursuing their reorganization in this case to maintain both its going concern and the value of Mechanic's collateral. Debtor believes that its assets are worth far more on a going concern basis than in a hypothetical liquidation of $600,000.00. The business grosses approximately $450,000 per month.

31. Approval of this Motion and the use of Cash Collateral on the terms identified in this Motion is in the best interest of the Debtor, the Debtor's estate and their creditors.

32. Absent the use of the Cash Collateral, Debtor would be unable to meet payroll and would be forced to lay-off their work force and to suspend operations immediately. Without the use of Cash Collateral, Debtor will be forced to commence liquidation proceedings, which would result in a significantly less dividend, or no dividend at all, to the unsecured creditors. The use of cash collateral will allow the Debtor to preserve the going-concern value.

**C. Adequate Protection**

33. 11 U.S.C. Section 363 of the Code provides that a party with an interest in property proposed to be used, sold, or leased by the debtor may receive adequate protection of

8

such interest before the debtor may use, sell or lease such property. The Debtor proposes to provide adequate protection to Mechanics through monthly cash payments, through granting of post-petition liens on the Debtor's personal property, and through the use of the Cash Collateral to maintain the going concern value of the Debtor's property (consisting entirely of machines, motor vehicles, tools, fixtures, equipment and inventory).

34. Section 361 of the Code provides that when adequate protection is required under Section 363 of the Code such adequate protection may be provided by –

> "(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under Section 362 of this title, use, sale or lease under section 363 of this title...
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease or grant results in a decrease in the value of such entity's interest in such property; or…"

35. Debtors propose to use the Cash Collateral in order to maintain and operate the business. As such, Debtor proposes a monthly payment of $1,908.00 to Mechanics as well as the granting of a replacement lien on the personal property, as adequate protection of Mechanic's claim. Once the use of cash collateral is established the Debtor anticipates filing adequate protection requests for payment to equipment lenders.

36. What constitutes adequate protection varies with the facts and circumstance of each particular case. Bankruptcy courts are vested with discretion to determine the form of protection that best reflects the spirit and intent of Section 361. *See In re Lackow Brothers, Inc.*, 10 B.R. 717, 720 (Bankr. S.D. Fla. 1981); *In re Family Investments, Inc.* 8 B.R. 572 (Bankr. W.D. Ky. 1981).

37. Regardless of its form, the entitlement to and measure of the adequate protection required is always determined by the extent of the diminution of value, if any, in the secured creditor's collateral, during the course of the bankruptcy case. *See In re First South Savings Assoc.* 820 F.2d 700, 710 (5th Cir. 1987).

38. "It is intended by the Bankruptcy Code only to assure that a secured creditor, during the pendency of a bankruptcy case, does not suffer a loss in the value of its interest in property of the bankruptcy estate." *In re Markos Gurnee Partnership* 252 B.R. 712, 716 ( Bankr. N.D. Ill. 1997). *See also United Savings Association of Texas v. Timbers of Inwood Forest Assoc. Ltd.,* 484 U.S. 365 (1988).

39. As adequate protection, Debtor proposes to provide monthly payments of $1,908.00, which represents the contract rate, proposes to grant Mechanics a replacement lien on the personal property of the estate against which Mechanics held a lien as of the Petition Date, and proposes to maintain and operate the business as a going concern, thus maintaining the personal property's value. The replacement lien shall maintain the same priority, validity and enforceability as Mechanic's pre-petition lien. The replacement lien shall be recognized only to the extent of the diminution in value of Mechanic's pre-petition collateral after the Petition Date resulting from the Debtor's use of the Cash Collateral during the bankruptcy case.

40. The Cash Collateral will be used as described in Debtor's budget attached. As such, the Cash Collateral is being used to preserve and maintain the Debtor's ongoing business. The Debtor's use of its income to operate and maintain the business constitutes additional adequate protection. *See In re McCann*, 140 B.R. 926, 929 (Bankr. D. Mass. 1992) *citing with approval In re Prichard Plaza, L.P.* 84 B.R. 298 (Bankr. D. Mass. 1988).

41. In addition, the Debtor's property is insured at replacement cost. This provides further adequate protection to Mechanics.

42. For all the foregoing reasons, Mechanic's collateral is not diminishing in value and the use of the Cash Collateral is therefore warranted.

### D. Payment of Debtors' Counsel Fees

43. Because of the State Court Order prohibiting use of funds beyond the ordinary course, Debtor seeks to carve-out from the use of cash up to $8,000.00 for Debtor's counsel fees[5]. Payments would be made in installments $1,000.00 per week for the initial 8 weeks of this case.

44. In addition, Debtor seeks to carve-out from the use of cash amounts to pay chapter 11 U.S. Trustee quarterly fees.

45. "A Debtor may use cash collateral to pay professional fees if the secured party is adequately protected…" *Security Leasing Partners L.P. v. ProAlert, LLC (In re ProAlert, LLC)* 314 B.R. 436 (9th Cir. BAP 2004).

46. "If the underlying collateral is not declining in value, the additional cash collateral may be used by the debtor to pay administrative expenses as well as to maintain and improve the underlying collateral." *In re Wrecclesham Grange, Inc.,* 221 B.R. 978, 981 (M.D. Florida 1997).

47. As previously demonstrated, Mechanics is adequately protected with monthly cash payments, replacement liens, insurance, and maintenance and operation of the business. Therefore, as Mechanics is adequately protected, Debtor may use cash collateral to pay their administrative costs.

---

[5] All fees are subject to court approval.

48. In addition, pursuant to 11 U.S.C. § 506(c) allow Debtor to pay administrative fees, including Debtor's counsel fees, from Mechanic's collateral that are reasonable costs and expenses of preserving or disposing of, such property.

49. Debtor believes that its reorganization prospects are excellent for many reasons, including primarily the availability of unencumbered assets as a source of DIP financing and the prospects off several new and profitable contracts this summer and fall.

### III.    NOTICE

50. The Debtor has served this Motion on (a) all known secured creditors; (b) the Office of the United States Trustee; (c) the Debtors' 20 Largest Unsecured Creditors; and (d) all parties who have filed a notice of appearance and request for notices in this proceeding.

WHEREFORE, the Debtor respectfully requests that this Court enter an Order:

    a. Approving the notice of this motion as described above;

    b. Authorizing the Debtor to use Cash Collateral on a continuing basis;

    c. Granting Mechanics a replacement lien in accordance with the terms of this motion;

    d. Authorizing the Debtor to use the Cash Collateral to pay Debtor's counsel fees and charge the collateral pursuant to 11 U.S.C. § 506(c) and 11 U.S.C. § 363;

    e. Scheduling additional consideration of the use of the Cash Collateral following the expiration of the authorization in this motion; and

    f.    Granting such other relief as is just and proper.

                              Respectfully submitted
                              The Debtor,
                              By their Attorney,

                              /s/ John M. McAuliffe
                              John M. McAuliffe, Esq.
                              McAuliffe & Associates, P.C.
                              430 Lexington Street
                              Newton, MA 02466
                              (617) 558-6889
                              BBO# 555109

Dated: October 12, 2017

**<u>EXHIBIT A</u>**

| | | | forecast base | forecast 1 | forecast 2 | forecast 3 | forecast 4 | forecast 5 | forecast 6 | forecast 7 | forecast 8 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Period Beginning** | | **10/13-10/14** | **10/15/2017** | **10/22/2017** | **10/29/2017** | **11/5/2017** | **11/12/2017** | **11/19/2017** | **11/26/2017** | **12/3/2017** |
| | | | 5 d | 5 d | 5 d | 5 d | 5d | 4d | 5d | 5d |
| | **Sales Projected** | | 15,000 | 93,116 | 100,378 | 107,952 | 116,203 | 110,500 | 75,000 | 90,000 | 90,000 |
| | Beginning cash (Book) | | 10,000 | 5,650 | 35,745 | 36,254 | 16,376 | (12,502) | (24,689) | 35,345 | (4,520) |
| **CASH COLLECTIONS** | | | | | | | | | | | |
| | AR, Received | | 6,000 | 100,775 | 68,570 | 60,473 | 53,243 | 63,761 | 105,613 | 78,817 | 84,111 |
| | | | | | | | | | | | |
| | Credit Card Sales | | | 8,464 | 9,124 | 9,812 | 10,597 | 10,044 | 6,818 | 8,181 | 8,181 |
| | Cash Sales | | | 540 | 582 | 626 | 676 | 641 | 435 | 522 | 522 |
| | **TOTAL INCOMING CASH** | | **16,000** | **115,429** | **114,022** | **107,165** | **80,892** | **61,944** | **88,176** | **87,520** | **92,814** |
| | COD | | | | | | | | | | |
| | **Direct Materials** | 40.00% | **6,000.00** | 37,246 | 40,151 | 43,181 | 46,481 | 44,200 | 30,000 | 36,000 | 36,000 |
| | **Payroll including burden** | 21.00% | 3,150 | 19,554 | 21,079 | 22,670 | 24,403 | 23,205 | 15,750 | 18,900 | 18,900 |
| | **Fuel Utilities and trucking** | 8.00% | 1,200 | 7,449 | 8,030 | 8,636 | 9,296 | 8,840 | 6,000 | 7,200 | 7,200 |
| | Sub total | 69.00% | 10,350.00 | 64,250 | 69,261 | 74,487 | 80,180 | 76,245 | 51,750 | 62,100 | 62,100 |
| **EXPENSES** | | | | | | | | | | | |
| * | Advertising | | - | | | | | - | | | |
| | Auto and Tolls | | - | $ 25 | $ 25 | $ 25 | $ 25 | $ 25 | $ 25 | $ 25 | $ 25 |
| | Fuel Retail | | - | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 |
| | Payroll Service | | - | $ 81 | $ 81 | $ 81 | $ 81 | $ 81 | $ 81 | $ 81 | $ 81 |
| | CC Expense/Bank | | - | $ 296 | $ 319 | $ 343 | $ 371 | $ 352 | $ 239 | $ 286 | $ 286 |
| | water | | - | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 | $ 50 |
| | legal and Administrative | | - | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 | $ 1,000 |
| | Registration/Excise Tax | | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | Permits(Over Weight/Heavy Highw | | - | | | | | | | | |
| | Meals T/E | | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | Software | | - | $ 215 | $ 215 | $ 215 | $ 215 | $ 215 | $ 215 | $ 215 | $ 215 |
| | Drug testing | | - | | | $ 50 | | $ 50 | | $ 50 | |
| | Plant and Equipment Repairs | | - | $ 600 | $ - | $ 600 | $ - | $ 600 | $ - | $ 600 | $ - |
| | Tires | | - | $ - | $ - | $ - | $ - | $ 1,200 | $ - | $ - | $ 1,200 |
| | Equipment and Truck rental | | - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | Trash | | - | $ 40 | $ 40 | $ 40 | $ 40 | $ 40 | $ 40 | $ 40 | $ 40 |
| | Office, Phones, IT | 0.55% | - | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 |
| | Rents | | - | | | $ 13,525 | | | | $ 13,525 | |
| Footnote 3 | Insurance Property/vehicle/WC | | - | $ 13,695 | | | $ 12,000 | | | $ 13,695 | |
| | Insurance Health | | - | | $ 7,344 | | | $ 7,344 | | | $ 7,344 |
| | (Employee Reimburseement) | | | $ (918) | $ (918) | $ (918) | $ (918) | $ (918) | $ (918) | $ (918) | $ (918) |
| | Taxes - Real Estate | | - | | | $ 941 | | | | $ 941 | |
| | | Sub Total | $ - | $ 15,434 | $ 8,506 | $ 16,302 | $ 13,214 | $ 10,389 | $ 1,082 | $ 29,940 | $ 9,673 |
| | Sub total outflows including direct costs | | $ 10,350 | $ 79,684 | $ 77,767 | $ 90,789 | $ 93,394 | $ 86,634 | $ 52,832 | $ 92,040 | $ 71,773 |
| | Sub Total Inflows net of sales tax | | $ 16,000 | $ 115,429 | $ 114,022 | $ 107,165 | $ 80,892 | $ 61,944 | $ 88,176 | $ 87,520 | $ 92,814 |
| | Sub Total Net Cash Flow Per Week | | $ 5,650 | $ 35,745 | $ 36,254 | $ 16,376 | $ (12,502) | $ (24,689) | $ 35,345 | $ (4,520) | $ 21,041 |
| | **Lien Holders Vehicles** | | | | | | | | | | |
| | Amur/Axis Capital/Triton | | | | | | $ 1,000.00 | | | | |
| Foot note 1 | Commercial Credit Group | | | | | | | | | | |
| foot note 2 | Commercial Credit Group | | | | | | | | $ 4,620.41 | | |
| | First Citizens Federal Credit Unit | | | | | | | | $ 541.00 | | |
| | Peoples United | | | | | | | | | | $ 2,480.00 |
| | Harbor One Bank | | | | | | | | | $ 750.00 | |
| | Ford Motor Corp | | | | | | | | | $ 599.00 | |
| | TCF | | | | | | | | | $ 2,000.00 | |
| | Wells Fargo | | | | | | $ 750.00 | | | | |
| | Mechanics Cooperative Bank | | | $ 1,908.00 | | | | $ 1,908.00 | | | |
| **Secured Obligations** | Sub Total Lien Holders Vehicles | | $ - | $ 1,908.00 | $ - | $ - | $ 750.00 | $ 2,908.00 | $ 5,161.41 | $ 3,349.00 | $ 2,480.00 |
| | **Subtotal Cash Flow** | | 5,650.00 | $ 33,836.73 | $ 36,254.15 | $ 16,375.79 | $ (13,252.18) | $ (27,597.39) | $ 30,183.09 | $ (7,869.33) | $ 18,560.67 |
| footnote 1 and 2 | principal after returns est | 220,000 | | | | | | | | | |
| | term | 5 year | | | | | | | | | |
| | interest | 9.50% | | | | | | | | | |
| | monthly | $4,620.41 | | | | | | | | | |
| Footnote 3 | estimated reduction from fleet reduction | | | | | | | | | | |